**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | Crim. No. 06-295 (RMC) |
| | : | |
| **EDWARD EVERETT BROWN JR.** | : | |

**GOVERNMENT'S REPLY TO DEFENDANT'S OPPOSITION
TO GOVERNMENT'S SUPPLEMENTAL MOTION TO INTRODUCE EVIDENCE OF
THE DEFENDANT'S OTHER CRIMES AND BAD ACTS**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby respectfully submits its Reply Memorandum in response to Defendant's Opposition to Government's Supplemental Motion to Introduce Evidence of the Defendant's Other Crimes and Bad Acts ("Defendant's Opposition").

Defendant claims that the supplemental other crimes or bad acts evidence the government seeks to introduce is "pure propensity evidence offered to prove the defendant's allegedly bad character" and "its probative value is substantially outweighed by the danger of unfair prejudice to defendant." See Defendant's Opposition at p. 1.  Defendant's arguments have no merit.

First, the evidence is not propensity evidence nor is it offered to show defendant's bad character.  The evidence is related to the defendant's scheme to obtain money from the Treasury Department Federal Credit Union.  Further, it shows the defendant's intent, knowledge, motive and lack of accident or mistake and therefore admissible under Fed. R. Evid. 404(b).  "A proper analysis under Rule 404(b) begins with the question of relevance: is the other crime or act relevant and, if so, relevant to something other than the defendant's character or propensity [to commit crime]?  If yes, the evidence is admissible unless excluded under other rules of evidence such as Rule 403."  United States v. Douglas, 482 F.3d 591, 596 (D.C. Cir. 2007), citing United

States v. Bowie, 232 F.3d 923, 930 (D.C. Cir. 2000). Given the government's burden of proving beyond a reasonable doubt all of the elements of the offenses charged, including the defendant's state of mind, the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

The government alleges that the defendant developed a scheme to defraud the Treasury Department Federal Credit Union and then presented two fictitious obligations for negotiation in order to effectuate the scheme. In his opening statement at trial, the defendant affirmatively stated that the critical issue in this case was the defendant's state of mind, "This is a case about intent. It's about Reverend Edward Brown's state of mind, what was in his head concerning these financial instruments, concerning these documents that he presented down at the bank, what was in his mind. That's going to be the question you're going to have to answer in this case." Appendix A, (April 10, 2007 Transcript) at 9. The government must prove the defendant's intent and knowledge and, in the case of bank fraud, his specific intent to deceive. Since the government cannot get into the mind of the defendant, it must prove those elements by other evidence.

The jury is likely to ask why did the defendant present a $5.5 million dollar fictitious instrument to the Treasury Department Federal Credit Union? Why did the defendant develop this scheme to defraud? What did he know about the negotiability of the fictitious obligations at the time he presented them? The jury can find some of the answers to these questions in the testimony relating to the defendant's attempt to purchase a $1.75 million dollar property in Maryland around the same time he presented the second fictitious obligation at the credit union. Judge Shanstrom correctly found that evidence relating to the real estate contact and sale was

direct evidence of the defendant's scheme to defraud and showed motive.[1]

In February 2006, the defendant sought out a real estate agent, claimed he was representing a foreign trust and obtained a real estate contract for a $1.75 million property in Maryland . The settlement agent testified that the defendant alleged the funds for the purchase of the property came from an overseas trust. Appendix B, (April 11, 2007 Transcript) at 195. According to the settlement agent's testimony, the settlement was supposed to occur on February 20, 2006. Appendix B, (April 11, 2007 Transcript) at 193. The settlement agent stated he expected a wire for the purchase price of the property, but that did not occur. Appendix B, (April 11, 2007 Transcript) at 195. There was a meeting with the defendant because the defendant's earnest-money deposit "bounced" (Government's Exhibit 22), and he was in default of the sales contract. Appendix B, (April 11, 2007 Transcript) at 192-93. The defendant presented to the settlement agent a "Statement of Account" which purported to have $5.5 million dollars in an account. See Government's Exhibit 28B; Appendix B, (April 11, 2007 Transcript) at 198. The defendant asked the settlement agent if he would accept a certified check for more than a million dollars over the purchase price of the property and give him a reimbursement check. Appendix B, (April 11, 2007 Transcript) at 195. The settlement agent testified that he felt uncomfortable and refused. Appendix B, (April 11, 2007 Transcript) at 204-05. He told the defendant that the funds had to be wired to their account or be a certified check for the amount of the purchase price. Appendix B, (April 11, 2007 Transcript) at 204-05. The government submits that since the settlement company did not accept his proposal to pay by "certified check," he presented the

---

[1] The government does not have the transcript relating to Judge Shanstrom's pre-trial rulings and is relying upon memory regarding Judge Shanstrom's rulings.

fictitious obligation to the Treasury Department Federal Credit Union. There was testimony that the defendant asked that funds from the credit union "check" (Government's Exhibit 11) be wired to the settlement company. Appendix B, (April 11, 2007 Transcript) at 203-04. The government anticipates that the real estate agent will confirm that the defendant provided the earnest money fictitious obligation and that the defendant claimed to have forgotten his wallet and failed to pay for the home inspection.

There are a number of reasons why the evidence is admissible and not presented to prove bad character or propensity. The government submits that the defendant's motive to present the check to the credit union in February 2006 was caused by his failure to get the settlement company to initially accept either that check or a similar one and give him a reimbursement of funds. It also shows what the defendant was trying to get when he presented the large fictitious obligation to the credit union–money and property. The fact that the earnest money check was also a fictitious obligation shows that the defendant had no intention of paying for the property with his own funds. It showed the defendant knowledge that the fictitious instruments were not negotiable and that he did not mistakenly present the fictitious obligation to the credit union. It shows his intent to commit the crimes of bank fraud and presenting a fictitious obligation. Likewise, the defendant's failure to pay for the home inspection by "forgetting" his wallet and failing to pay back the real estate agent illustrate that his presentation of the fictitious obligation was intentional and not a mistake or accident.

Certainly, the supplemental evidence falls within "an act that is part of the charged offense" or "uncharged acts performed contemporaneously with the charged crime. . . if they facilitate the commission of the charged crime" United States v. Bowie, 232 F.3d 923, 929

(D.C. Cir. 2000).  It also satisfies Fed. R. Evid. 404(b) as evidence relating to "a matter in issue other than the defendant's character or propensity to commit crime."  Id. at 930.  The defendant's request that the Court limit the government's evidence to what happened at the credit union is, in essence, asking the Court to place the government's evidence in a vacuum.  There was a motive to the defendant's actions.  There was evidence of the defendant's intent.  The government should not be constrained in presenting that evidence.  "Indeed, proof of intent is one of the core bases for admitting evidence of other crimes or bad acts."  United States v. Douglas, 482 F.3d at 598, citing Huddleston v. United States, 485 U.S. 681, 685 (1988).

Since the defendant's state of mind-- his intent, his knowledge and his motive are the critical issues that the government must prove beyond a reasonable doubt, the probative value of the evidence substantially outweighs the possibility of unfair prejudice.  "[I]t is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged."  Id., at 600, citing United States v. Cassell, 292 F.3d 788, 795 (D.C. Cir. 2002).  Moreover, if the Court finds the evidence admissible under Fed. R. Evid. 404(b), it should give the jury a limiting instruction about the use of the evidence, which should protect the defendant from any unfair prejudice.

## CONCLUSION

For the reasons set forth in this Reply and the Government's Motion To Introduce Evidence of the Defendant's Other Crimes and Bad Acts, the government hereby respectfully

requests that it be permitted to introduce at trial Government's Exhibit 22 and testimony relating to the home inspection.

        Respectfully submitted,

        JEFFREY A. TAYLOR
        United States Attorney


        _____
        Diane G. Lucas, D.C. Bar #443610
        Assistant United States Attorney
        555 Fourth Street, N.W., Fourth Floor
        Washington, DC 20530
        (202) 514-7912


        Certificate of Service

    I hereby certify that on May 24, 2007, a copy of this pleading was served by electronic mail upon Jonathan Jeffress, Esquire., Federal Public Defender's Office.


        _____
        Diane G. Lucas
        Assistant United States Attorney

1

```
1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2

3

4   UNITED STATES OF AMERICA,    )
                                 )
5            Plaintiff,          )
                                 )
6   v.                           )   Criminal No. 06-295 (RMC)
                                 )
7   EDWARD EVERETT BROWN, JR.,   )
                                 )
8            Defendant.          )

9

10

                     TRANSCRIPT OF PROCEEDINGS
11
                       (Excerpts of Jury Trial)
12

13                         Washington, D.C.
                            April 10, 2007
14
                                Vol. 1
15                            Pages 1-117

16


17  BEFORE: THE HONORABLE JACK SHANSTROM
            United States District Judge, and a Jury.
18

19


20  Appearances:

21       OFFICE OF THE FEDERAL PUBLIC DEFENDER
              By: DIANE G. LUCAS, ESQUIRE
22                Counsel for the United States

23       OFFICE OF THE FEDERAL PUBLIC DEFENDER
              By: JONATHAN JEFFRESS, ESQUIRE
24                Counsel for Defendant

25       The Defendant appearing in person.
```

Paul L. McManus, RMR, Official Court Reporter

1  defendant, with the intent to defraud, presented these
2  instruments to the credit union for negotiation.
3         Ladies and gentlemen of the jury, after you have heard
4  all of the evidence, the government will ask you to find the
5  defendant guilty as charged.  Thank you.
6         MR. JEFFRESS:  Ladies, gentlemen of the jury, this is
7  a simple case.  It's simply overblown.  This is a case about
8  intent.  It's about Reverend Edward Brown's state of mind, what
9  was in his head concerning these financial instruments,
10 concerning these documents that he presented down at the bank,
11 what was in his mind.  That's going to be the question you're
12 going to have to answer in this case.
13        That question under the law that the judge will give
14 to you is whether Reverend Brown had the intent to defraud,
15 okay?  That's just sort of a legalese way of saying whether he
16 was trying to fool the people down at the bank.  Was he trying
17 to deceive them to trick them?  Was he trying to have the bank
18 believe that the documents that he was presenting down there
19 were actual financial instruments?  Was he trying to make them
20 believe that this was a check just like any other check,
21 actually drawn on a real checking account?  Or do we have
22 something different here?  Was Mr. Brown acting in good faith?
23 Did he honestly believe that Mr. Brown honestly believed,
24 however misguided he was, did he believe in his mind that these
25 documents were actually worth something?  That he could get

```
 1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
 2

 3

 4  UNITED STATES OF AMERICA,    )
                                 )
 5           Plaintiff,           )
                                 )
 6  v.                            )   Criminal No. 06-295 (RMC)
                                 )
 7  EDWARD EVERETT BROWN, JR.,   )
                                 )
 8           Defendant.           )

 9

10                    TRANSCRIPT OF PROCEEDINGS

11                    (Excerpts of Jury Trial)

12
                           Washington, D.C.
13                          April 11, 2007

14                              Vol. 2
                            Pages 118-278
15

16

17  BEFORE: THE HONORABLE JACK SHANSTROM
            United States District Judge, and a Jury.
18

19

20  Appearances:

21       OFFICE OF THE FEDERAL PUBLIC DEFENDER
                By: DIANE G. LUCAS, ESQUIRE
22                 Counsel for the United States

23       OFFICE OF THE FEDERAL PUBLIC DEFENDER
                By: JONATHAN JEFFRESS, ESQUIRE
24                 Counsel for Defendant

25       The Defendant appearing in person.
```

Paul L. McManus, RMR, Official Court Reporter

COPY

1  Q.   Okay. Now in this document it appears that Mr. Brown may
2  be or have shares or a beneficiary of this trust; is that
3  correct?
4  A.   On this document, yes, ma'am.
5  Q.   Did Mr. Brown talk with you about his status as a
6  beneficiary of this trust at all?
7  A.   I don't believe so, no.
8  Q.   Now, did he give you any other documents that you can
9  recall --
10      Let me rephrase the question. Not at that -- let's go
11 ahead and answer the question.
12 A.   Not at that time.
13 Q.   Did there come a point in time when he gave you some
14 subsequent documents?
15 A.   Yes, ma'am.
16 Q.   And were those faxed or were those handed to you in person?
17 A.   They were handed to me in person.
18 Q.   Okay. Could you describe to the ladies and gentlemen of
19 the jury what led to your meeting with Mr. Brown?
20 A.   We had a meeting with Mr. Brown -- with regards to the
21 contract, there's something called an earnest-money deposit that
22 has to be put down as a good faith that the buyer is going to
23 continue to purchase the property, and that good-faith deposit
24 is the seller's assurance that the buyer is going to go through
25 on a contract and not default, and that's the consideration for

1  them taking the house off the market and not continuing to show
2  it.  I found out from Sam that the earnest-money deposit check
3  had bounced, and so we needed to set up a meeting with
4  Mr. Brown, because at that point he was in default of the
5  contract, and the seller at that point is getting nervous
6  because we had to make a disclosure -- or Coldwell Banker had to
7  make a disclosure to the listing agent who is representing the
8  seller at that time that that check came back, what I was told
9  that it had bounced.  So that's what sparked the meeting that we
10 had with Mr. Brown.
11 Q.   And did you set that up with him?
12 A.   I don't believe -- I didn't set it up.  I think the real
13 estate agent had set it up, but the real estate agent had asked
14 me to come with them to the meeting.
15 Q.   Okay.  Let me ask you this:  When was the contract signed
16 by the parties in terms of this property?  Yes, you can refer to
17 the contract.
18 A.   You can, when you look at Page 10 of the contract it has
19 the dates on which everyone signed it, and it's showing it was
20 signed on the 2nd -- I'm sorry, the 7th of February, 2006.
21 Q.   And when was the settlement supposed to take place
22 according to this contract?
23 A.   According to the contract, it's found on Page 1, it was
24 supposed to occur Monday, February the 20th of 2006.
25 Q.   Okay.  Now you said you had a meeting after the

*M. Hurd - Direct*                                                          195

```
 1  Q.   And where did he say he was going to get it from?
 2  A.   It was supposed to be, initially supposed to be wired in
 3  from this trust.
 4  Q.   Okay.  And where was it supposed to be wired in from?
 5  A.   Overseas.
 6  Q.   And was there any wire to that effect?
 7  A.   We never received a wire.
 8  Q.   Okay.  Now, with regards to the actual amount, did Mr.
 9  Brown ever discuss wanting to wire more than what the value of
10  the property was?
11  A.   He, he never stated that he wanted to wire more, because
12  what happened was he was initially supposed to wire in the exact
13  amount for the property, and then that wire wasn't going to be
14  able to come in, so he wanted for us then to accept a certified
15  check in an amount way over the purchase price, and I think it
16  would have pretty much meant we would have been given him a
17  reimbursement check, if I remember correctly, of over a million
18  dollars.
19  Q.   And do you remember when that conversation took place?  Was
20  that before or after your meeting with him?
21  A.   It may have been around, right around the same day.  I
22  would, I imagine -- I don't remember.  I don't remember, I
23  apologize.
24  Q.   Now I'm going to hand you what's been marked as
25  Government's Exhibit No. 24 and ask whether you recognize that
```

*M. Hurd - Direct*                                                    198

1  Q.   Did he give you any other type of instrument along with the
2  silver surety bond and the processing instructions?
3  A.   I remember getting some UCC filing statements.
4  Q.   Okay. But did you get any type of, any type of actual
5  instrument that looked like a check or anything like that?
6  A.   I didn't personally receive a check or anything that
7  resembled a check from Mr. Brown.
8  Q.   Now, when Mr. Brown said he had an account, this trust had
9  an account overseas and it had money in the UK, did you ask for
10 any type of verification of those funds?
11 A.   We, we -- I didn't, I didn't personally ask him for
12 verification.
13 Q.   Did he submit to you any type of purported verification?
14 A.   He did, he did show me something that showed that there
15 were some type of monies somewhere, because we weren't receiving
16 the wire as of yet.
17 Q.   I'm going to hand you what's been marked as Government's
18 Exhibit 28B and ask if you recognize that?
19 A.   Yes, ma'am.
20 Q.   And what is that?
21 A.   This is one of the documents that were faxed to me that
22 shows that there was some type of, there was a previous balance
23 and that the balance is no longer there.
24 Q.   And that was for what amount of money?
25 A.   5.5 million.

Paul L. McManus, RMR, Official Court Reporter

1  remember if the seller signed it, but we -- Mr. Brown did sign
2  the addendum agreeing to be the purchaser, then that's why I
3  added the language at the bottom, because it wasn't enough that
4  he had signed to himself, I also had to have a representative
5  from the Arcturus Telecommunications releasing any claims that
6  they had under the contract which is why I wrote the bottom
7  half.
8  Q.   And that would be, is that the Government's Exhibit No. 30?
9  A.   No, ma'am, that's Government's Exhibit No. 29.
10 Q.   Okay.  And did you ever meet the individual who was listed
11 there?
12 A.   Who signed the bottom?
13 Q.   Yes.  Carlos Robert --
14 A.   No.
15 Q.   And how did you get that document?  How was it signed?  Was
16 it sent by mail or fax or --
17 A.   It was sent by fax.
18 Q.   Okay.  Now, there was a, if we could look at Government's
19 Exhibit No. 30, can I ask what is this particular document?
20 A.   This one is another extension.
21 Q.   Okay.
22 A.   So what we did is we just extended it out until the 3rd of
23 March, with regards to the same terms again, the money being
24 paid to the seller and then all the other services to remain in
25 full force and effect.  The reason why we do that is we don't

1  want this to be deemed to be changing any of the provisions that
2  have already been agreed to.
3  Q.   Now let me ask you this:  Did you ever have a conversation
4  with any bank or credit unions with regards to a wire transfer?
5  A.   Yes, ma'am.
6  Q.   And who did you have contact with?
7  A.   I don't remember the individual's name.  I don't know if he
8  was a teller or a bank manager.
9  Q.   Did you wire him any or fax him any instructions?
10 A.   Yes, ma'am.  We were told that the wire was supposed to be
11 coming in from a credit union, and so to complete our standard
12 practice, whenever we're having a bank wire us money, we have to
13 send them our wiring instructions which gives them what the ABA
14 routing number, the account number, and then a reference number,
15 so that way whenever we're receiving all these wires we know
16 which accounts to put them into and which files to put them
17 into.
18 Q.   Who told you the money was coming from a credit union?
19 A.   Mr. Brown.
20 Q.   Let me ask you this.  Did you ever receive any wire with
21 regards to this contract from Mr. Brown or Arcturus
22 Telecommunications Enterprise?
23 A.   No, ma'am.
24 Q.   Just hand you Government's Exhibit No. 16 and ask whether
25 you recognize it?

*M. Hurd - Direct*                                                                 204

```
 1  A.    Yes, ma'am.
 2  Q.    And what is that?
 3  A.    These were the wire instructions that I would have faxed.
 4  Q.    Did the sale ever go through?
 5  A.    No, ma'am.
 6  Q.    Other than the original issue about where the money was
 7  coming from the UK, then it was going to come from a credit
 8  union here, was there any other alternative provided by
 9  Mr. Brown in terms of payment for the property?
10  A.    Again, he was going to provide us a check directly, a
11  certified check.
12  Q.    And did that happen?
13  A.    No.  I had talked to my, my manager with regards to that,
14  and they stated that because that other check had already
15  bounced and we didn't want to shell out good money on a check,
16  that he wanted to be able to verify.  So I told Mr. Brown we
17  couldn't reimburse him such a large amount from our account
18  because of the past practice, and even if that check hadn't have
19  bounced, there was no way to get my manager to reimburse him at
20  the table over a million dollars.
21        So later that night they said we could do it, we would take
22  the check, but we would have to wait for it to clear before he
23  could disburse the funds.  And then later on that night I
24  approached my manager the next day and just said I would feel
25  more comfortable at this point if we would just accept the wire,
```

1  that way it kind of puts the responsibility on a bank entity
2  that probably is more set up to make sure that, when that wire
3  hits our account, we know we have good funds.
4  Q.   So you never were shown or Mr. Brown never gave you an
5  actual instrument or anything like that?
6  A.   Other than the silver surety bond, no, ma'am.
7  Q.   Okay.  And in terms of that silver surety, what did
8  Mr. Brown say that was supposed to represent?
9  A.   He told me that was as good as cash.
10 Q.   And did you try to present that anyplace?
11 A.   No.
12         MS. LUCAS:  Thank you.  I don't think I have anything
13 further.
14                        CROSS-EXAMINATION
15 BY MR. JEFFRESS:
16 Q.   Good afternoon.
17 A.   Good afternoon, sir.
18 Q.   Did Ms. Lucas tell you what this case is about?  Here?
19 A.   I'm sorry?
20 Q.   Did Ms. Lucas tell you what this case is about here?  The
21 charges in the indictment against Mr. Brown?
22 A.   I assumed that they were with regards to some of the
23 documents that I received, but I don't know the exact charges
24 against him, no, sir.
25 Q.   Does it relate to two instances at the Treasury Department